**UNITED STATES of America**

**v.**

**MESSERLIAN, Harry H.,
Appellant in 85–5323.**

**UNITED STATES of America**

**v.**

**WOLKOWSKI, Henry F.,
Appellant in 86–5345.**

**Nos. 86–5323, 86–5345.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 9, 1987.

Decided Nov. 5, 1987.

Rehearings and Rehearings En Banc
Denied Dec. 4, 1987.

See also, D.C., 633 F.Supp. 1493.

Joseph A. Hayden, Jr. (argued), Hayden
& Perle, Hoboken, N.J., Matthew P. Boylan

(argued), Theodore V. Wells, Jr., Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor, Roseland, N.J., for appellants.

Lisa J. Stark (argued), U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for appellee.

Before HIGGINBOTHAM and STAPLETON, Circuit Judges, and CONABOY, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal arises from the convictions and sentences of New Jersey State Troopers Harry H. Messerlian and Henry F. Wolkowski, in connection with the death of arrestee Joseph P. Topolosky, while in police custody, following a traffic accident on the New Jersey Turnpike in July, 1982. For the reasons set forth below, we will affirm defendants-appellants' convictions and sentences on all counts.

### I.

### A. PROCEDURAL HISTORY

On July 31, 1982, Joseph P. Topolosky was pronounced dead on arrival at the St. James Hospital in Newark, New Jersey, following his arrest for driving while intoxicated. Shortly thereafter, New Jersey state authorities initiated an investigation into the events that led to Topolosky's death. On November 24, 1982, a grand jury in Union County, New Jersey, returned a one count indictment that charged Trooper Messerlian with second-degree manslaughter. *See* N.J.Stat.Ann. § 2C:11–4(b)(1) (West 1982). Following the discovery of new evidence, however, the matter was submitted to a second Union County grand jury, which voted not to return an indictment against Messerlian. Consequently, the original manslaughter indictment was dismissed on April 28, 1983.

On July 25, 1985, following an investigation by the United States Department of Justice, a federal grand jury returned a multiple count indictment against Messerlian, charging him with violations of 18 U.S.C. § 242 (1982)[1] (deprivation of civil rights), 18 U.S.C. §§ 371 and 1503 (1982)[2] (conspiracy to obstruct justice) and 18 U.S.C. § 1623 (1982)[3] (false declarations). The same indictment charged appellant Henry F. Wolkowski with conduct in violation of 18 U.S.C. § 371 (conspiracy to ob-

---

* Honorable Richard P. Conaboy, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

1. Section 242, Deprivation of rights under color of law, provides:

 Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

 18 U.S.C. § 242 (1982).

2. Section 371, Conspiracy to commit offense or to defraud United States, provides in pertinent part:

 If two or more persons conspire either to commit any offense against the United States,

or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
18 U.S.C. § 371 (1982).

Section 1503 defines the underlying offense at issue in this appeal. That section, labelled "Influencing or injuring officer or juror generally," provides in pertinent part:

 Whoever ... corruptly ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years or both.
18 U.S.C. § 1503 (1982).

3. Section 1623, False declarations before grand jury or court, provides in pertinent part:

 (a) Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 ....

struct justice) and 18 U.S.C. § 1623 (false declarations). Specifically, the indictment charged that Messerlian, acting under color of law, fatally struck Joseph P. Topolosky and thereby willfully deprived Topolosky of his constitutional right to liberty without due process of law in violation of 18 U.S.C. § 242. The indictment further charged that Messerlian and Wolkowski, together with State Troopers George J. Mangione and Brian Slattery,[4] conspired in violation of 18 U.S.C. § 1503 (1982) to cover up the alleged assault and thereby prevent state and federal investigation of the circumstances surrounding Topolosky's death.

Following a three month trial before the Honorable Anne E. Thompson,[5] the jury returned a unanimous verdict of guilty on all counts against Messerlian. Wolkowski was found guilty of conspiring to obstruct justice and not guilty of making false declarations. Subsequently, both appellants filed motions for judgments of acquittal, or alternatively, for new trials. After a hearing, the district court entered an order on April 29, 1986, denying all post-trial motions. On May 13, 1986, the district court sentenced Messerlian to concurrent terms of ten years imprisonment on Count 1, three years imprisonment on Count 2 and three years imprisonment on Count 3. Wolkowski was sentenced to one year imprisonment on his conviction for conspiring to obstruct justice. On May 12, 1986, the district court granted and denied motions by Wolkowski and Messerlian, respectively, for bail pending appeal. On June 16, 1986, this Court vacated the district court's order denying Messerlian bail pending appeal. *United States v. Messerlian*, 793 F.2d 94 (3d Cir.1986). These appeals followed and were consolidated by order of this Court dated August 13, 1986.

Messerlian advances three principal arguments on appeal. First, Messerlian maintains that the district court failed to instruct the jury properly on the crucial element of specific intent under section 242. Second, Messerlian argues that Count 2 of the indictment is legally insufficient because it charges appellants with a conspiracy to obstruct federal proceedings that had not commenced at the time the alleged conspiracy was formed. Third, Messerlian contends that the government's failure to disclose exculpatory expert medical opinion requires reversal of his conviction, and that the district court erred in denying his motion for a new trial based on newly discovered evidence. This evidence consisted of the testimony of Dr. Marvin Aronson, Medical Examiner for the City of Philadelphia. *See infra* subsection C.

Appellant Wolkowski joins in Messerlian's second and third contentions. In addition, Wolkowski makes two related arguments regarding his conspiracy conviction. First, Wolkowski argues that the evidence at trial was insufficient to support a reasonable jury verdict that he conspired to obstruct justice. Alternatively, Wolkowski maintains that the district court erred in denying his motion for a new trial because the jury's verdict is against the weight of the evidence and constitutes a miscarriage of justice.[6]

Due to the nature of appellants' arguments, we turn now to a detailed account of the facts as developed at trial.

## B. FACTS

### 1. The Constitutional Deprivation

On July 30, 1982, between 10:30 and 10:45 p.m., Joseph P. Topolosky parked his

(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence. 18 U.S.C. § 1623 (1982).

4. Mangione and Slattery were also charged separately with obstruction of justice and making false declarations. *See* 1 Joint Appendix of Defendants–Appellants Harry H. Messerlian and Henry F. Wolkowski in Support of Briefs on

Appeal ("Jt. App.") at 18a–20a. Each was acquitted on all counts.

5. Honorable Anne E. Thompson, United States District Judge for the District of New Jersey.

6. We have considered the remaining contention of appellant Wolkowski that the district court erred in denying his motion to be severed from joint trial with Messerlian and find it to be without merit.

van—occupied by himself and his two children, then ages four and five—in the left lane of the New Jersey Turnpike. A car driven by Nelson Velazquez collided with the rear of the van when the vehicle immediately in front of the car suddenly swerved to the right. Velazquez and the passengers in his car—Luis Guzman, Abimael Fontanez and Gloria Ruiz—got out of the car and went to the van to determine whether its occupants were hurt.

Upon approaching the van, Fontanez observed the driver resting his head on his arm. Fontanez roused Topolosky and asked him if he was all right. Topolosky raised his head and responded that he was fine. *See* Supplemental Appendix ("SA") at 13. Velazquez smelled alcohol on Topolosky and believed him to be drunk. *Id.* at 232, 260. Velazquez, Fontanez and Guzman observed no cuts, bruises, bleeding or injuries of any kind on Topolosky's face.[7] *Id.* at 13, 232, 264–65. They therefore returned to their car to examine the damage and to wait for the police.

Within ten to twenty minutes, New Jersey State Police Troopers Messerlian and Kenneth McClelland arrived at the scene of the accident. The troopers talked initially with the four occupants of the Velazquez vehicle and determined that no one was seriously injured. The troopers then approached the van and attempted to wake Topolosky, who appeared to be asleep. After smelling alcohol on Topolosky's breath, Messerlian and McClelland pulled him out of the van, placed him under arrest, cuffed his hands behind his back, escorted him back to the cruiser and placed him in the rear seat. As Topolosky walked to the cruiser, Velazquez, Ruiz, and Fontanez observed that he had no facial injuries. *See* SA at 26, 76, 236.

After placing Topolosky into the cruiser, Trooper McClelland attended to Topolosky's children while Trooper Messerlian be-

gan setting flares to alert oncoming traffic to the accident. Thereafter, Topolosky, while lying handcuffed in the back seat of the cruiser, kicked out the left rear window. *See* SA at 28, 238, 267. In response to this disturbance, Messerlian, according to Velazquez and Fontanez, entered the cruiser and struck Topolosky three or four times on his face and neck with a flashlight. *Id.* at 28–29, 250–53; *see also id.* at 493, 495–96 (testimony of Gary McWhorter). Ruiz testified that she observed Messerlian strike Topolosky in the head but could not identify the object used. *Id.* at 80. She did see a flashlight in Messerlian's hand, however, immediately before he entered the cruiser. *Id.* at 78–79. Guzman testified that he saw Messerlian with "an object, black and long" in his hand, and that his hand was "going up and down" while he was in the back seat of the cruiser. *Id.* at 269–70. Also, Velazquez, Fontanez and Guzman each testified to hearing the Topolosky children cry out "[d]on't hit my father, don't hit my father." *Id.* at 33, 242, 271.

Following the episode in the cruiser, Messerlian returned to interview the accident victims. During this time, Velazquez, Fontanez and Ruiz each went back to the cruiser, where they saw Topolosky lying motionless in the back seat with blood running from his mouth and face. *See* SA at 34, 881, 241. After completing their interviews, the troopers radioed ahead to the state police barracks, informing the senior trooper that they were returning to the station with a drunk driver. *Id.* at 163. When Messerlian arrived at the state police barracks,[8] Topolosky's "face was puffy. There was a slight amount of blood on his mouth, and he appeared to be unconscious." *Id.* at 100 (testimony of Sergeant Nicholas Sheyka, acting supervisor, Newark state police barracks, July 30, 1982). Due to the condition of Topolosky, the su-

---

7. Ruiz testified that she could not remember whether she had actually approached the van to check on its occupants. *See* SA at 70.

8. The record indicates that when Messerlian returned to the barracks he was accompanied by a Trooper Sinckler instead of Trooper McClelland. *See* SA at 97–98. Apparently, Trooper

Sinckler arrived on the scene to assist in overseeing the removal of the vehicles. Trooper McClelland, who had been attending to the Topolosky children, left the scene in another police car to escort the children home. *See* SA at 403.

pervising trooper, Sergeant Sheyka, instructed Messerlian to remove the handcuffs so that Topolosky could be taken to a hospital. Sergeant Sheyka proceeded upstairs to call an ambulance. *Id.* Thereafter, Topolosky was taken to St. James Hospital, where at 12:10 a.m., Dr. Lawrence Dalglish, the attending physician in the emergency room, pronounced him dead on arrival. *Id.* at 137.

At trial, the "central fact issue was whether Messerlian hit Topolosky with a flashlight and caused his death or whether Topolosky's death was caused by the car accident, or by Topolosky hitting his head on the car door or some object in the car." Defendant–Appellant Harry H. Messerlian's Brief on Appeal ("Messerlian's Brief on Appeal") at 7. In his examination report, Dr. Dalglish had written: "Pupils dilated, glazed cornea, left eye swollen shut. Blood oozing from mouth, and a marked DOA." SA at 141. At trial, Dr. Dalglish further described Topolosky's external injuries. Specifically, he stated that the left side of Topolosky's face was swollen, bruised and discolored; his lip was lacerated; his face and nostrils were covered with some blood; the left side of his neck was bruised and swollen; the left eye was surrounded by little hemorrhages; his pupils did not react to light; his blood pressure, pulse and respiration were zero; and his body was lifeless. *See id.* at 137–38, 140–41, 148. Based on these observations, Dr. Dalglish stated his opinion that the injuries to Topolosky's face and neck were consistent with having been beaten with a flashlight. *Id.* at 151–52. He further stated his

opinion that those injuries were not self-inflicted. *Id.* at 147.

On July 31, 1982, Dr. Rudolf Platt, Assistant State Medical Examiner for the State of New Jersey, performed the initial autopsy on Topolosky. His examination revealed swelling, contusions, and lacerations to the left side of the neck and face accompanied by considerable hemorrhage beneath these injuries. *See* SA at 289–90, 295–99. An internal examination of the skull revealed a subarachnoid hematoma [9] at the base of the brain. *Id.* at 295–97, 299–304. Dr. Platt also noted that the left side of the complete upper denture worn by Topolosky was missing. *Id.* at 294. On August 4, 1982, a second autopsy was performed by Doctors Platt and Stefan Epstein. In addition to the earlier findings of Dr. Platt, the second autopsy revealed a fracture of the maxilla, a bone extending from the lower eyelid down to the gum, on the left side of Topolosky's face. *See id.* at 311–17.

On September 30, 1982, Dr. Charles Hirsch, a forensic neuro-pathologist, dissected and examined Topolosky's brain and similarly concluded that the cause of Topolosky's death was a traumatic subarachnoid hematoma. SA at 357–59. Both Drs. Hirsh and Platt indicated that, in their medical opinion, the manner of Topolosky's death was a homicide, the result of external, blunt blows or impacts to the head and neck. SA at 335, 361–63. In so concluding, each expressly ruled out the possibility that the fatal injuries were the result of natural causes, self-inflicted injury or the automobile collision.[10] *See id.* at 335–36, 362–65.

9. Dr. Platt described a subarachnoid hematoma as an extensive collection of blood in a circumscribed area. *See* SA at 299–300.

10. Among the factors that Drs. Hirsch and Platt considered relevant to their conclusion that the manner of death was a homicide were: (1) that there was no evidence of aneurysm, vascular malformation or other congenital defects, thus ruling out the possibility of natural causes, SA at 305–08, 329, 333, 335, 347, 353–56; (2) that there was no blood in the van or on Topolosky's clothing, *id.* at 321, 363, no objects in the van that may have caused the fatal injuries, *id.* at 320, 322, no injury to Topolosky's children, *id.* at 321, 363, minor damage to the van, *id.* at 363;

and that there was blood in the cruiser, Topolosky's denture plate was found in the cruiser, *id.* at 364, and that, although a subarachnoid hemorrhage almost invariably results in immediate loss of consciousness, Topolosky walked from the van to the cruiser, *id.* at 366, thus cumulatively ruling out the possibility that the fatal injuries were sustained in the van or as a result of the collision; and (3) that there was no injury to Topolosky's prominent facial features, like the nose or forehead, which would have resulted from thrashing about in the back seat of the cruiser, *id.* at 326–27, 365, and that, at any rate, thrashing about would not produce injuries consistent with those causing Topolosky's death, *id.*

In addition to the eyewitness testimony and medical evidence, the government introduced evidence at trial to show that state troopers receive training regarding the impact that blows to particular parts of the body have, and to show that troopers are aware that blows to the neck and face area constitute deadly force. *See* SA at 169–72, 277–78, 281–82. Troopers are instructed to use such force only when a person cannot be controlled by a lesser degree of force or when that person is likely to endanger the life of, or cause serious bodily harm to, another. *Id.* at 280.

In his defense, Messerlian presented testimony by several state troopers that on three prior occasions—in August 1968, March 1978 and September 1979—Topolosky had exhibited violent, self-destructive behavior while intoxicated and in police custody.[11] Messerlian also presented seven character witnesses from the New Jersey State Police who testified that, during his approximately ten year tenure as a state trooper, Messerlian had a reputation as a quiet, peaceful and non-violent individual. *See* SA at 396–402.

Messerlian's medical evidence consisted of testimony by two medical experts, Dr. Leslie Lukash, Chief Medical Examiner for Nassau County, New York, and Dr. Richard Lindenberg. Each of these witnesses testified that, although he agreed with the government's experts that Topolosky's death was caused by a subarachnoid hematoma, it was his opinion that the manner of Topolosky's death could not be conclusively determined. Dr. Lukash opined that Topolosky may have died naturally as the result of a ruptured aneurysm or accidentally as the result of the automobile collision. Dr. Lukash also indicated that some of Topolo-

sky's injuries were consistent with his alleged thrashing about in the back seat of the cruiser. He could not, however, rule out the possibility that the fracture to Topolosky's face was the result of blows with a flashlight. *See* SA at 420–21. Dr. Lindenberg also opined that Topolosky died naturally as the result of a ruptured aneurysm or accidentally from the impact of the collision. Additionally, he noted that Topolosky might have died from hypertension due to his thrashing about in the cruiser. Finally, Dr. Lindenberg unequivocally maintained that Topolosky's fatal injuries could not have resulted from external blows with a flashlight.[12] *See* SA at 464–65, 474–75, 482.

### 2. The Conspiracy and Perjury Counts

Count 2 of the indictment charged Messerlian and Wolkowski, along with Troopers Slattery and Mangione, *see supra* note 4, with conspiracy to obstruct the due administration of justice. Specifically, the government argued that appellants conspired to prevent all law enforcement agencies from learning that Messerlian had assaulted Topolosky. It charged that the following overt acts occurred in furtherance of the conspiracy: (1) Messerlian, Wolkowski and others "agreed not to report the fact that Messerlian had assaulted Topolosky;" (2) Messerlian, Wolkowski and others "failed to provide routine information" to the hospital concerning the circumstances of Topolosky's death; (3) Wolkowski, Mangione and Slattery knowingly omitted accounts of the alleged assault from statements prepared during interviews with Velazquez, Guzman and Fontanez; (4) Messerlian and others agreed to fabricate a

at 330–31, 364, thus ruling out the possibility of death by self-inflicted injury.

**11.** On cross-examination, however, the government established that the only documented injury to Topolosky during these three detentions was a bloody nose and that no officer had found it necessary to strike Topolosky during his alleged outbursts in order to subdue him. *See* SA at 371–72, 384, 390–91, 394–95.

**12.** Dr. Lindenberg based his conclusion that Topolosky received no blows to the head with a

flashlight upon his examination of the injury itself. He found irrelevant to his analysis eyewitness testimony that Messerlian had struck Topolosky around the head and neck. Specifically, although conceding that Topolosky's fatal injuries could have resulted from trauma, Dr. Lindenberg testified that he "d[id]n't need the testimony neither by the Puerto Ricans nor by anybody else who supposedly observed [the alleged beating] to explain that Topolosky did not receive a blow to the head." SA at 462–63.

story attributing Topolosky's death to self-inflicted injury on a K–55 radar unit and a briefcase; (5) Messerlian testified falsely before the second Union County grand jury; (6) Wolkowski, Mangione and Slattery made false declarations before the federal grand jury; and (7) Messerlian falsely testified before the federal grand jury as to whether he had assaulted Topolosky.

At trial the government introduced evidence that, after the hospital notified the Newark state police barracks that Topolosky was dead, Sergeant Wolkowski was called at home almost immediately, and that he arrived at the barracks shortly thereafter to initiate and supervise an internal investigation into the circumstances of Topolosky's death. Additionally, the jury heard testimony that, on the night of Topolosky's death, Wolkowski was the chief investigative officer at the barracks for approximately four hours. SA at 112–14, 164, 181. During this time, although Wolkowski separately interviewed both Messerlian and McClelland, he made no notes of either interview and failed to file a report.[13] Moreover, Wolkowski failed to provide information to the hospital concerning the circumstances surrounding Topolosky's death. SA at 161–62. Based on this evidence, the government argued that, "once Wolkowski spoke to Messerlian and his partner, he did nothing [with respect to the investigation into Topolosky's death]

... other than inspect the police cruiser and answer some telephone calls." Brief for the United States, Appeal No. 86–5345, at 8.

At approximately 4:40 a.m., over three hours after Wolkowski's arrival at the barracks at 1:00 a.m., Lieutenant Herbert Orth, the acting unit supervisor of the Major Crimes Unit ("MCU"),[14] took over the investigation of Topolosky's death. After MCU detectives left the Newark barracks, however, Wolkowski was left in charge of interviewing three of the occupants of the Velazquez vehicle in order to ascertain how Topolosky died. Wolkowski personally interviewed Velazquez and briefed Troopers Mangione and Slattery on how to conduct the interviews of Guzman and Fontanez. See SA at 214–25. Velazquez, Guzman and Fontanez each testified that they told Wolkowski, Mangione and Slattery that they had witnessed one of the troopers assault Topolosky on the turnpike. None of the interview reports, however, mentioned the assault or made any reference to Topolosky's physical condition.[15] See Brief for United States, Appeal No. 86–5345, at 8–9. In addition, both Velazquez and Fontanez testified that, after they had reported the alleged assault during their interviews, they observed Wolkowski conferring with both Mangione and Slattery.[16]

---

**13.** Wolkowski testified before the federal grand jury that although written records were customary "in normal investigation[s,] ... [t]his was out of the ordinary" because it involved a trooper in his barracks and because "somebody died in custody." SA at 177–78.

**14.** The Major Crimes Unit is a unit of State Police detectives with state-wide jurisdiction to conduct investigations at the direction of the ranking officer of the State Police. See Defendant–Appellant Henry F. Wolkowski's Brief on Appeal ("Wolkowski's Brief on Appeal") at 11.

**15.** Velazquez, Fontanez and Guzman, who are Hispanic, indicated that they signed the incomplete statements prepared by Wolkowski, Slattery and Mangione in part because of their lack of proficiency in English. When they were reinterviewed by MCU detectives a few days later, however, each told the investigators that they had witnessed the assault and that they had reported it to the troopers during their initial

interviews. See SA at 45–47, 212, 494–500, 506. In addition, all four of the occupants of the Velazquez vehicle testified before both Union County grand juries and the federal grand jury that issued the instant indictments that they had witnessed the assault. On all three occasions, Velazquez, Fontanez and Guzman again indicated that they had reported the incident to Wolkowski, Mangione and Slattery.

**16.** Specifically, Velazquez testified that each time he informed Wolkowski of the assault on Topolosky, Wolkowski "scratched his head and left the room." SA at 248–49. On two of the three occasions that Wolkowski left the interview, Velazquez observed him talking to Mangione and Slattery. Id. at 249. Fontanez testified that during his interview, Wolkowski entered the room and whispered something to Slattery "in secret." Id. at 43. Fontanez indicated that Slattery then removed the statement from the typewriter and followed Wolkowski out of the room. Id. at 44.

Finally, the government introduced evidence that, notwithstanding the testimony of the eyewitnesses, Wolkowski repeatedly denied ever receiving information about the alleged assault. In two interviews conducted by Lieutenant Orth of MCU, Wolkowski indicated that he had received no information from Velazquez concerning an assault on Topolosky, and that he had received no information from Mangione or Slattery that Guzman or Fontanez had made allegations of any wrongdoing. *See* SA at 199–200, 201–04, 214–25. In addition, the government introduced into evidence Wolkowski's testimony before the federal grand jury that, during his interview of Velazquez, Velazquez never mentioned anything about a beating and that Wolkowski never specifically asked Velazquez about the fatal injuries Topolosky sustained.[17]

With respect to Messerlian's involvement in the alleged conspiracy to obstruct justice, the government argued that Messerlian attempted throughout the investigation to mislead the authorities by offering contradictory accounts of the events on the turnpike. Specifically, the government introduced evidence that Messerlian, in his initial interview with MCU detectives, reported that, while he was setting flares to alert oncoming traffic to the accident, he observed Topolosky banging his head against the windows in the cruiser. Messerlian also stated that he observed Topolosky kick out the left rear window of the cruiser. Messerlian stated that at this point—after Topolosky kicked out the window—he entered the front seat of the cruiser and grabbed Topolosky, who then fell asleep. *See* SA at 205–06.

In his accident report filed within a week of the incident, Messerlian reasserted that he had observed Topolosky banging his head on the left rear window of the police cruiser. Messerlian noted, however, that the disturbance stopped once he reached the vehicle. There was no reference in this report to Messerlian's having entered the cruiser in response to the disturbance. SA at 87.

In November 1982, over three months after the incident, Messerlian was interviewed by Lieutenant Orth. During this interview, Messerlian, for the first time,

17. Sergeant Wolkowski's testimony reads as follows:

QUESTION: Your testimony is that Mr. Nelson Velasquez [sic], when you interviewed him on July 31st, 1982, never told you that he had witnessed a trooper striking Mr. Topolosky.
ANSWER: That is correct, he did not.
QUESTION: Your purpose in interviewing Mr. Velasquez was to find out how Mr. Topolosky might have suffered fatal injuries. Is that correct sir?
ANSWER: Yes.
QUESTION: Would you point to any place in this statement where Mr. Velasquez gave you any information or where you asked any particular question to find out what he knew about how Mr. Topolosky had been injured?
ANSWER: ... There is no question like that.... The only line in here is his ... response [where he told me] ... he observed the driver of the van began to get excited and started to move from side to side, and kicked out the window. There is no question. I didn't ask him any question of that. I just said about an injury. What he had said here, I assumed that is what his injuries were.
QUESTION: But, Sergeant, you knew that, ... you knew generally that Mr. Topolosky had not died as a result of lacerations to his legs, that caused extensive bleeding and caused him to expire, didn't you? I mean you didn't think that was—you didn't think that his kicking out this window explained his death, did you, sir?
ANSWER: I don't know. I don't know what you mean by that.
QUESTION: My question is whether you thought this line in here about Mr. Topolosky having kicked out the window in any way explained any injuries that he might have suffered, did that explain any injuries as far as you were concerned?
ANSWER: The fact that he got excited and was moving side to side, he kicked out a window, I don't know what injuries might have occurred from that.... I don't know.
QUESTION: Did you ever ask Mr. Velasquez if he had observed any injuries on Mr. Topolosky?
ANSWER: I asked Mr. Velasquez to tell me what he noticed and this is what he told me, and this is what I put down.
QUESTION: My question, sir, is whether you asked him specifically to tell you what injuries he observed on Mr. Topolosky.
ANSWER: No, I didn't ask that question.
QUESTION: Did you ask any follow-up questions when he gave you this narrative response?
ANSWER: "Do you have anything further to tell me," and he said he didn't.
SA at 245–47.

indicated that on the night of Topolosky's death there was a K–55 radar unit and a briefcase in the back seat of the police cruiser. *See* SA at 216. Subsequently, when testifying before the second Union County grand jury, Messerlian indicated that he reentered the cruiser before the window was broken, observed Topolosky repeatedly banging his head against the briefcase and radar unit and attempted to prevent him from hurting himself. *Id.* at 88–96. Finally, Messerlian unequivocally stated before the federal grand jury that he never struck Topolosky either with his fists or with his flashlight. *Id.* at 349–51.

In addition to highlighting the inconsistencies in Messerlian's accounts of the events on the turnpike, the government offered evidence that overwhelmingly established that on the night of the alleged assault there was no briefcase or radar unit in Messerlian's cruiser. Nine witnesses, including the occupants of the Velazquez vehicle, the ambulance crew that transported Topolosky to the hospital and several state troopers involved in the subsequent investigation testified that they did not see a briefcase or a radar unit in the back seat of the cruiser on the night of the accident. *See* SA at 36 (testimony of Fontanez), 84 (testimony of Ruiz), 102 (testimony of Sergeant Sheyka), 126–27 (testimony of Miles Kelly, ambulance crew member), 135 (testimony of John Couto, ambulance crew member), 190 (federal grand jury testimony of Sergeant Wolkowski), 193 (testimony of Sergeant MacArthur). Moreover, the daily activity log for Messerlian's cruiser indicated that no radar unit had been assigned to him on the night Topolosky sustained his fatal injuries. *See id.* at 115–16, 120–23, 167.

To counter the government's evidence relating to the alleged conspiracy, Wolkowski introduced evidence suggesting that his involvement in the investigation of Topolosky's death was fortuitous and that he merely acted within the structured chain of command of the New Jersey State Police. He introduced evidence in an attempt to prove that he was called into the investigation solely because he lived approximately ten minutes away from the Newark barracks and was the detective most frequently summoned in emergency situations. Sergeant Sheyka, the senior trooper on duty on the night of the accident, testified that, after learning that Topolosky was pronounced dead on arrival at the hospital, the first persons that he notified were Lieutenant Russell MacArthur, the duty operations officer, and Sergeant First Class Weber, the station commander. *See* SA at 105–06. According to Sheyka, Wolkowski was notified "to make sure [Sheyka] ... covered all the bases on who to notify, what to do." *Id.* at 106. Sheyka also expressed his understanding that the duty officer, Lieutenant MacArthur, "[would] make [the] ... decision[s] on what is going to transpire, not Detective Sergeant Wolkowski." *Id.* at 113. Wolkowski also introduced evidence that he was not required to make a report of his initial interviews with Messerlian and McClelland unless directed to do so by MCU detectives.

With respect to the government's allegation that Wolkowski orchestrated the taking of false statements, MCU detective Gary McWhorter testified that he instructed Wolkowski to take the statements from the three witnesses and to use troopers from the barracks to assist him. *See* Jt. App. at 86a. According to McWhorter, Wolkowski did not volunteer to take the statements, *id.* at 85a, but was asked to do so as an accommodation to MCU. *See id.* at 86a. In addition, Sergeant Anthony Simonetti, the shift supervisor who replaced Sergeant Sheyka, testified that he independently selected Troopers Mangione and Slattery to assist in conducting the witness interviews and did not inform Wolkowski until after they had been selected. *See id.* at 87a. Wolkowski also introduced the testimony of several police officers who were present at the barracks at the time the statements were taken that they did not observe Wolkowski leave the interview room or confer with Mangione or Slattery during the course of the interview. *See* Wolkowski's Brief on Appeal at 18–20.

Finally, Wolkowski presented seven character witnesses who testified to Wolkowski's reputation for honesty and trustwor-

thiness. *See* Jt. App. at 73a, 74a, 74.2a, 76a, 77a, 80a–81a; SA at 485–86.

### C. MOTION FOR A NEW TRIAL

Following the return of the jury verdicts, a new issue arose involving allegations of prosecutorial misconduct during the course of the litigation.[18] The testimony of Dr. Aronson, Medical Examiner for the City of Philadelphia, raised the question whether the prosecution concealed from Messerlian and Wolkowski exculpatory evidence that could have aided them in their defense. Dr. Aronson testified that, after a request by the prosecution, he reviewed the circumstances surrounding the death of Topolosky. After conducting his review, he orally advised Assistant United States Attorney Anne Singer of his opinion that Topolosky's death resulted from the automobile accident and not from a beating. *Id.* at 1495.

Based on Dr. Aronson's testimony, Messerlian and Wolkowski moved for judgments of acquittal or for new trials. Alternatively, they requested a hearing to determine whether the government had violated the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires disclosure of exculpatory evidence to the defense, or whether the testimony of Dr. Aronson constituted new evidence sufficient to warrant a new trial under Federal Rule of Criminal Procedure 33. After a hearing on the motions, the district court concluded that Dr. Aronson's testimony was not credible, and that, at any rate, his testimony was cumulative and would not have altered the jury's verdict. Consequently, the district court rejected defendants-appellants' *Brady* arguments, *Messerlian,* 633 F.Supp. at 1500–04, and their contention that Dr. Aronson's testimony constituted new evidence sufficient to warrant a new trial. *Id.* at 1504–10.

The district court also rejected Wolkowski and Messerlian's claims that there was insufficient evidence to sustain their convictions. *Messerlian,* 633 F.Supp. at 1513, 1515. Wolkowski's claims that the failure

to grant his motion for severance was fatal error, that the instruction on the conspiracy count was improper, and that a new trial was warranted based on the weight of the evidence, were similarly rejected. *Id.* at 1512–15. Accordingly, the district court concluded that Messerlian and Wolkowski received a fair trial and that all post-trial motions must be denied. *Id.* at 1515.

## II.

We turn now to appellants' contentions on appeal. We shall consider first those claims specifically related to Messerlian's appeal from his conviction of violating the civil rights of Joseph Topolosky. Next, we shall consider those claims common to both Messerlian's and Wolkowski's appeals. Finally, we shall consider those claims peculiar to Wolkowski's appeal from his conviction of conspiracy to obstruct justice.

### A. SPECIFIC INTENT ELEMENT OF § 242

Messerlian's primary contention on appeal is that the district court improperly instructed the jury on the crucial element of specific intent under § 242. In particular, Messerlian argues that the district court's instructions "permitted the jury to convict Messerlian on the basis of mere excessive force." Messerlian's Brief on Appeal at 12–13. In this regard, Messerlian admonishes that "[i]f th[e] [district court's] charge is correct, then every intentional use of force by a police officer [that] is later deemed to be excessive violates § 242." Defendant-Appellant Harry H. Messerlian's Reply Brief ("Messerlian's Reply Brief") at 8. Additionally, Messerlian argues that the evidence adduced at trial was insufficient to support a jury verdict beyond a reasonable doubt that he possessed the requisite specific intent under § 242.

 A district court's duty to provide the jury with guidelines so that it may

---

**18.** A detailed account of the facts underlying those allegations is fully set forth in a lengthy and comprehensive decision by the district court rejecting defendants-appellants motions

for new trials and need not be repeated here. *See United States v. Messerlian,* 633 F.Supp. 1493 (D.N.J.1986).
.

draw appropriate conclusions from the evidence is satisfied by "a clear articulation of the relevant legal criteria," *United States v. Goldblatt,* 813 F.2d 619, 623 (3d Cir. 1987), and the determination of the particular language to be employed when charging the jury is within the sound discretion of the district court. *See id.* In assessing the propriety of the district court's instructions, we must " 'determine whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury [without confusing or misleading the jurors].' " *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1195 (3d Cir. 1984) (citations omitted), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985). If the jury charge is adequate, we must consider Messerlian's claim that the evidence is nonetheless insufficient to support his conviction. In addressing this claim, our task is to "view[ ] the evidence in the light most favorable to the prosecution," *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and to sustain the verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (original emphasis); *accord United States v. Martorano,* 709 F.2d 863, 866 (3d Cir.) ("When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether a jury could reasonably infer from the evidence that the defendant is guilty of the offense with which he is charged."), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).

### 1. The Jury Charge

Although Messerlian generally contests the adequacy of the district court's instructions to the jury on the issue of specific intent, he also selects three paragraphs of the jury charge and argues that "[v]iewed together, these paragraphs ... convey that if Messerlian intentionally struck Topolosky with his flashlight, and if this conduct was excessive under state law, then the jury was entitled to find Messerlian guilty of a § 242 violation." Messerlian's Brief on Appeal at 21–22. We disagree.

The challenged provisions of the district court's charge read as follows:

You may find that the defendant Messerlian acted with the requisite specific intent, even if you find he had no real familiarity with the Constitution, or with a particular constitutional right involved, provided you find that the defendant willfully and consciously did the act which deprived the person of his constitutional rights.

Jt. App. at 796a–97a.

If you find that Mr. Messerlian knew what he was doing, and that he intended to do what he was doing, and if you find that what he did constituted a deprivation of a constitutional right, then you may conclude the defendant Messerlian acted with the specific intent to deprive the victim of a constitutional right.

*Id.* at 797a.

Obviously, not every striking by a police officer or use of force by a police officer would constitute a violation of the constitutional right of a citizen. It is only when it is excessive, unreasonable, and unnecessary, and beyond that which is authorized under state law, for such officers to use.

*Id.* at 799a.

Essentially, Messerlian's objection to the jury charge is two-fold. First, Messerlian contends that the above challenged provisions of the jury charge inaccurately characterize the applicable law in that they authorize the jury to make a *post hoc* determination whether the force employed by Messerlian was excessive, which, if found, could properly support a conviction under § 242. Second, Messerlian maintains that, consistent with the government's theory and evidence at trial, the district court was required to instruct the jury that, in order to convict, it *must* find that Messerlian possessed the specific intent to punish Topolosky. Although we agree with Messerlian that a conviction based solely on the mere use of excessive force would be contrary to the law, we disagree with his assertion that the challenged provisions of the court's instructions or, indeed, that the

instructions as a whole, have the effect of sanctioning such a conviction. Further, we reject Messerlian's contention that the district court was required to instruct the jury that the only basis upon which it could convict was the intent to inflict summary punishment. In any event, we find that the district court properly charged the jury on the issue of summary punishment.

In *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Supreme Court rendered its seminal decision defining the specific intent required to support a criminal prosecution under the federal civil rights law.[19] The Court held that "the specific intent required by the Act is an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." *Id.* at 104, 65 S.Ct. at 1037. It is beyond dispute that the "right to personal security," *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982), is such a right.[20] *See United States v. Dise*, 763 F.2d 586, 588 (3d Cir.) ("personal security and freedom from bodily restraint, have always been protected by the due process clause of the fourteenth amendment"), *cert. denied*, 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 341 (1985).

■ Elaborating on the requirement of specific intent, the Court in *Screws* identified two bases for a proper § 242 conviction. First, the Court indicated that proof of an intentional deprivation of a person's constitutional rights could sustain a conviction under § 242. In this regard, the Court noted that

> [t]he fact that ... [a] defendant[ ] may not have been thinking in constitutional terms is not material where the[ ] aim was not to enforce local law but to deprive a citizen of a right and that right

was protected by the Constitution. When they so act they at least act in reckless disregard of constitutional prohibitions or guarantees.

*Screws*, 325 U.S. at 106, 65 S.Ct. at 1037–38. Second, the Court observed that "those who decide to take the law into their own hands and act as prosecutor, jury, judge, and executioner plainly act to deprive a prisoner of the trial [that] due process of law guarantees him [or her]." *Id.* Where proof of such intent to inflict summary punishment exists, a conviction under § 242 is proper.

■ We have reviewed the instructions of the district court as a whole and find that they comport with the legal standard set forth in *Screws*. Moreover, viewing the challenged instructions in isolation, we find that the district court accurately instructed the jurors on the governing law. Specifically, the first provision attacked by Messerlian merely summarizes the holding in *Screws* that the defendant need not be thinking in constitutional terms to violate the statute. Nor does the district court's reference to willful and conscious action render the charge defective. The district court carefully defined for the jury the term "willfulness" as requiring proof of an act "done voluntarily and intentionally, and with the specific intent to do something [that] the law forbids." Jt. App. at 796a. Thus, the challenged passage did not permit the jurors to convict Messerlian solely on the basis of a conscious assault. *See Dise*, 763 F.2d at 591 (approving a similar instruction).

Messerlian's objection to the second quoted passage from the district court's charge represents an inartful attempt at deception. As it appears in the district court's actual charge to the jury, that passage precedes a brief recess in the proceed-

---

19. *Screws* considered the predecessor statute to 18 U.S.C. § 242 (1982).

20. This Court has consistently acknowledged that the fourteenth amendment's guarantee of personal security includes protection from unwarranted invasion by official authority. *See, e.g., Black v. Stephens*, 662 F.2d 181, 188 (3d Cir.1981) ("law enforcement officer's ... appli-

cation of undue force may deprive the victim of a fourteenth amendment 'liberty' without due process of law") (citations omitted), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Rhodes v. Robinson*, 612 F.2d 766, 772 (3d Cir.1979) ("due process clause ... extends to protection from an official's abusive exercise of his powers to inflict grossly undue harm").

ings and merely operates to summarize the court's lengthy instructions to the jury up to that point. In particular, that paragraph, read in context, instructed the jury that they could convict only if they found that Messerlian deprived Topolosky of a constitutional right and that Messerlian knew what he was doing was a violation of the law.

Finally, as pointed out by the government, the last passage challenged by Messerlian "accurately describes what constitutes a constitutional violation. It does not address the issue of specific intent at all." Brief for the United States at 40. In other words, the district court merely informed the jury about when the use of force by a police officer rises to the level of a constitutional violation. The question whether the officer intentionally exerted such force knowing it to be unlawful is not addressed in this passage.

We find that the district court's instructions did not permit or encourage the jury to convict Messerlian solely on the basis of an intent to strike. Our decision today is reinforced by a prior decision of this Court approving instructions virtually identical to those challenged by Messerlian. *United States v. Dise,* 763 F.2d 586 (3d Cir.), *cert. denied,* 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 341 (1985). We find Messerlian's attempts to distinguish *Dise* unpersuasive.

Messerlian also challenges the district court's jury charge on the ground that it failed to instruct the jury that a finding of specific intent to inflict summary punishment was necessary in order to convict. Messerlian bases his argument in part on his interpretation of the government's evidence and on a statement by the district court that "the evidence adduced in the Government's case could allow the jury to find beyond a reasonable doubt that Messerlian administered 'a physical beating as punishment for allegedly breaking the law....'" Jt. App. at 360a (quoting *United States v. Delerme,* 457 F.2d 156, 161 (3d Cir.1972).

■ As *Screws* and its progeny make clear, violations of § 242 are not limited to willful inflictions of summary punishment.

Indeed, as noted by this Court in *Dise* a violation of § 242 is established if a defendant "acted in reckless disregard of the law as he understood it." 763 F.2d at 592. Moreover, evidence was admitted at trial on the amount of force that may be used to subdue a prisoner. The district court specifically referred to such evidence in its instructions to the jury. *See* Jt. App. at 795a, 799a. Thus, the government was entitled to a charge under both theories.

■ Finally, we find that the district court's instruction on the issue of summary punishment accurately stated the law and provided the jury with the proper guidelines on which to convict. In pertinent part, that instruction provides:

> If you conclude that Messerlian's actions were an expression of retaliation or summary punishment for the act of Topolosky kicking out the car window in the troop car, and you conclude each of the other elements has been proven then you may find Mr. Messerlian guilty of Count 1.

Jt. App. at 802a. We conclude that the district court's instructions on summary punishment were not in error.

### 2. Sufficiency of the Evidence

■ We now consider Messerlian's claim of insufficiency of evidence to support a jury finding of specific intent. We believe the facts speak for themselves. As the district court found,

> the record allows a reasonable juror to conclude that, one, Messerlian administered the blows [that] have been described by the medical experts; and two, that he did so not for any legitimate police purpose, such as for the protection of persons or property, but rather for the purpose of administering punishment.

> We find that the evidence adduced in the government's case could allow the jury to find beyond a reasonable doubt that Messerlian administered "a physical beating as punishment for allegedly breaking the law[, acting] as prosecutor, judge, and jury." *United States v. Delerme,* 457 F.2d 156, 161 (3d Cir.1972).

*Messerlian,* 633 F.Supp. at 1515. In addition, as is described in the preceding section, there was sufficient evidence from which a rational trier of fact could conclude that Messerlian used excessive force, specifically intending to use such force and knowing it to be excessive.

Messerlian's contention that the time he was in the cruiser was not sufficient for him to form a specific intent is specious. Under this reasoning, a single, deliberate and fatal blow could never rise to the level of a violation under § 242. Furthermore, Messerlian's argument fails to take into account the amount of time that he acknowledged elapsed immediately preceding the actual assault.

### B. MESSERLIAN'S CONVICTIONS ON COUNTS 2 AND 3

Notwithstanding our conclusion that Messerlian was properly convicted on Count 1, we briefly address his claim that reversal on Count 1 necessarily requires reversal on Counts 2 and 3. We conclude that Messerlian's claim is utterly without merit.

Messerlian contends that because of the "significant interrelationship" between Counts 1, 2 and 3, absent a proper conviction on Count 1, "there is no doubt that the jury would also have returned verdicts of not guilty as to the remainder of the indictment." Messerlian's Brief on Appeal at 30. In support of this contention, Messerlian points to a colloquy between the district court and the prosecution in which the implications of a Count 1 not guilty verdict on the remaining counts were discussed. *Id.* at 31. At issue is this observation by the district court: "One reality has to do with did the assault take place, and then the other reality has to do with did people try to cover up the assault, but now we have to go back to whether the assault took place." *Id.*

The district court's statement in no way supports Messerlian's claim. The central fact issue at trial, as characterized by Messerlian, was whether he had actually struck Topolosky with his flashlight, causing Topolosky's death, or whether Topolosky died by other means. The quoted statement is relevant, then, only if the jury concluded that Messerlian had done nothing at all. As noted by the government, the jury could reasonably acquit on Count 1 and still find that Messerlian committed an assault, sought to conceal that fact, specifically entered into a conspiracy to obstruct justice and perjured himself toward that end. *See* Brief for the United States, Appeal No. 86–5323, at 45–47. Accordingly, we reject Messerlian's argument that his convictions on Counts 2 and 3 cannot be sustained.

### III.

We turn now to those claims common to both Messerlian's and Wolkowski's appeals.

### A. THE LEGAL SUFFICIENCY OF COUNT 2

█ Appellants challenge their convictions of conspiracy to obstruct justice on two grounds. First, they argue that Count 2 is defective because it fails to charge that a federal judicial proceeding was pending or imminent at the time the alleged conspiracy was formed. Second, appellants contend that the district court improperly instructed the jury that it could convict if it found that a federal proceeding was foreseeable. We find both claims without merit.

First, Messerlian and Wolkowski were convicted of conspiring to obstruct justice in violation of 18 U.S.C. § 371 (1982). In *United States v. Perlstein,* 126 F.2d 789 (3d Cir.), *cert. denied,* 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752 (1942), this Court—construing the predecessor statute to § 371—addressed and rejected the very argument raised by appellants today.[21]

---

21. The specific question addressed by the *Perlstein* Court was:

Were the appellants properly convicted on a count charging them with conspiracy to obstruct justice ... when the conspiracy was entered into at a time when there was no proceeding pending ..., though continued into a period when there were proceedings pending ..., and acts in furtherance of the conspiracy were committed both prior to and

Upholding convictions of conspiracy to obstruct justice, the *Perlstein* Court distinguished the requisite elements for a conspiracy prosecution from those that undergird the substantive offense of obstruction of justice. Specifically, this Court recognized that,

> [w]hile it is true that the obstruction [of justice] can arise only when justice is being administered, that is to say when a proceeding is pending, there is nothing to prevent a conspiracy to obstruct the due administration of justice in a proceeding which becomes pending in the future from being cognizable under Section 37.

126 F.2d at 796. Moreover, the *Perlstein* Court was unable to

> see [any] reason why persons who conspire together to obstruct justice in a proceeding before a United States Commissioner or in a district court [that] they expect or fear will be instituted should not incur the penalties prescribed by Section 37 of the Criminal Code even if it be assumed that they could not be found guilty of the substantive crime described in Section 135, provided that one of them does an overt act designed to consummate their purpose and the commission of that act affects a pending proceeding.[22]

*Id.* at 795. *Perlstein* clearly controls the instant appeal. None of the arguments advanced by appellants convinces us of the contrary. Indeed, the decisions relied upon by appellants merely reiterate the proposition recognized in *Perlstein*, that to convict on the substantive offense of obstructing justice, a judicial proceeding must be pending. 126 F.2d at 796; *accord Pettibone v.*

United States, 148 U.S. 197, 206, 13 S.Ct. 542, 546, 37 L.Ed. 419 (1893); *United States v. Shoup*, 608 F.2d 950, 959–60 (3d Cir.1979); *United States v. Walasek*, 527 F.2d 676, 678 (3d Cir.1975). Accordingly, we hold that the conspiracy charge contained in Count 2 of the indictment is legally sufficient.

■ For similar reasons, we reject appellants' related claim that the district court erroneously instructed the jury on the conspiracy count. The district court's charge on Count 2 reads in pertinent part:

> The conspiracy charged in Count 2 of this indictment alleges that each of the defendants conspired with each other corruptly to impede the due administration of justice in violation of federal law. In the context of this case, the phrase corruptly impeding the due administration of justice relates to an intent to obstruct the federal Grand Jury's investigation into the circumstances surrounding the death of Joseph Topolosky. The Government is not required to prove that the federal Grand Jury's investigation was actually obstructed, nor does the government need prove that a Federal Grand Jury was hearing evidence in this matter at the time the conspiracy was formed. Rather, it is sufficient for the government to prove that each defendant willfully participated in the lawful plan with the understanding that one of its objectives was, *or would foreseeably become the obstruction of a Federal Grand Jury investigation*. As stated, each defendant must shown [sic] to have willfully participated in the unlawful plan.

after the commencement of the proceedings referred to?
126 F.2d at 793.

**22.** Appellants' argument that *Perlstein* is inapplicable because the alleged conspiracy in the instant appeal was "directed at a state investigation, not at a federal judicial proceeding," Wolkowski's Brief on Appeal at 38–39, is without merit. Count 2 of the indictment charged appellants with conspiring to obstruct the administration of justice. As part of the plan and purpose of the conspiracy, the indictment charged that appellants sought to "prevent the citizens of the District of New Jersey and law enforcement authorities of New Jersey and the United States"

from learning of the assault on Topolosky. Jt. App. at 17a; *see also Messerlian*, 633 F.Supp. at 1513 ("the government's theory [was] that the conspiracy [was] aimed at preventing disclosure to 'all comers'"). Similarly, in *Perlstein*, the conspiracy charged was "one to suppress evidence and to keep persons ... from disclosing what they knew to any investigating agency or body whether of the State of New Jersey or of the United States." 126 F.2d at 792. Thus, the government's reliance in part on overt acts designed to obstruct state or both state and federal proceedings does not render the indictment defective.

Jt. App. at 808a–09a (emphasis added). Appellants maintain that the italicized portion of the district court's instructions "permitted the jury to find the defendants guilty if it found that they agreed to obstruct only state judicial proceedings so long as it also found that it was foreseeable that federal grand jury proceedings would commence in the future." Wolkowski's Brief on Appeal at 41–42.

We think that appellants misread the plain language of the jury charge and, further, that they misunderstand the requisite elements necessary to sustain a conspiracy conviction. First, we find that the jury charge clearly required the government to prove that the conspirators undertook to obstruct the due administration of justice in a federal proceeding that they anticipated would commence in the future. In other words, the charge authorized the jury to convict if the federal proceeding was foreseeable to the conspirators and they willfully agreed to engage in certain activity that they knew and intended would obstruct justice in the anticipated federal proceeding should it actually commence in the future. Second, *Perlstein* makes clear that the federal proceeding need not be pending at the time the conspiracy is formed. Indeed, the primary purpose of the conspiracy charged in the instant indictment was the total prevention of such proceedings by deliberately concealing evidence that could form the basis of a federal prosecution.[23] We find no error in the charge to the jury on Count 2.

## B. NONDISCLOSURE OF DR. ARONSON'S OPINION

The next claim common to both Messerlian's and Wolkowski's appeals is that the government's failure to disclose the opinion it obtained from Dr. Aronson constitutes a violation of both the rule enunciated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Federal Rule of Criminal Procedure 16. Specifically, appellants reassert their contention raised before the district court that the government was required to disclose Dr. Aronson's opinion to the defense under *Brady.* In addition, appellants argue for the first time on appeal that the government's failure to disclose Dr. Aronson's oral report to the defense constitutes a breach of its duty under Fed.R.Crim.P. 16(a)(1)(D) to provide the defense with "any result or report" of tests or examinations.

■ Following the trial in this matter, after reading a newspaper account of the conviction of Trooper Messerlian in connection with the death of Joseph Topolosky, Dr. Aronson, through his attorney, informed the district court that he had provided arguably exculpatory evidence to Assistant United States Attorney Anne Singer. Specifically, Dr. Aronson maintained that in March 1984, Singer contacted him and requested that he examine certain documents and records concerning the death of Topolosky and formulate a preliminary opinion as to the manner and cause of death. Dr. Aronson indicated that, following his review of the materials, he had a telephone conversation with Singer in which he indicated that in his opinion Topolosky's death resulted from the automobile collision. At that time, according to Dr. Aronson, Singer thanked him for his services, requested that he send her a bill, and relieved him of any further involvement in

---

23. Appellants argue in the alternative that, even if the district court properly instructed the jury as to the foreseeability of a federal proceeding, "there is no evidence on the record to support a jury finding that the defendants could have foreseen that federal judicial proceedings would commence." Wolkowski's Brief on Appeal at 42. We find this argument to be completely untenable. Wolkowski and Messerlian were, respectively, twenty-five and ten year veterans of the New Jersey State Police. On that basis alone, knowledge that federal investigations often follow where an arrestee suspiciously dies in policy custody may be properly imputed to them. At any rate, the government introduced evidence that police trainees are instructed in the Constitution and on the rights of detainees. *See* SA at 291–92. In addition, from the evidence presented in connection with the § 242 allegation concerning police training on what constitutes lawful conduct, the jury could legitimately infer that both Messerlian and Wolkowski understood that certain conduct could constitute a violation under either state or federal law, or both.

the case. Singer, however, testified that Dr. Aronson never related to her his opinion that Topolosky died as a result of the automobile accident. Instead, Singer recalled Dr. Aronson's opinion as being generally consistent with the medical evidence already obtained.

The district court subsequently held an evidentiary hearing on the alleged *Brady* violation. After hearing testimony from both Dr. Aronson and Assistant United States Attorney Singer, the district court issued a comprehensive opinion in which it explicitly concluded "that Dr. Aronson came into court, sat in the witness stand, took an oath, and, for reasons unknown, lied." *Messerlian*, 633 F.Supp. at 1495. The court found that "Dr. Aronson did not tell Ms. Singer that he held the opinion that Joseph Topolosky's death was caused by the motor vehicle accident." *Id.* at 1501. Rather, "[t]he substance of the oral opinion [that] Dr. Aronson communicated to Ms. Singer was that the cause of death was a subarachnoid hemorrhage caused by blows of moderate force." *Id.* Based on these findings, the district court concluded that the government was not in possession of exculpatory evidence and, thus, could not have violated *Brady*. We agree.

The district court findings and conclusions are based "to a significant degree on an assessment of intangible factors—tone of voice, manner of reacting to questions, responses to questions and attitudes displayed...." *Messerlian*, 633 F.Supp. at 1501. More importantly, the district court found that Dr. Aronson's "recollection [of the opinion he had conveyed to Ms. Singer] apparently moved in a steady fashion from a point where he had suggested possible alternative manners of death to the final point, at the hearing ... where he stated his final conclusion that the death should be classified as accidental, as having been caused by the motor vehicle accident." *Id.* at 1502. Accordingly, the district court concluded that "the enhancement[, on four separate occasions,] of [Dr. Aronson's] recollection of transmitting exculpatory infor-

mation [to Ms. Singer,] ... call[ed] into question the reliability of that recollection." *Id.* at 1501.

Appellants' argument on appeal does not specifically challenge the findings and conclusions of the district court. *See* Messerlian's Brief on Appeal at 38. Instead, appellants imply that a close reading of the entire record of the post-trial hearing requires reversal of the district court's finding that no *Brady* violation had occurred. We disagree. Having undertaken the task urged upon us, we conclude that the district court's findings of fact with regard to the credibility and reliability of Dr. Aronson's testimony are not clearly erroneous. Notwithstanding the directness of the district court's credibility findings, that court was best situated to observe the demeanor of the two witnesses and to assess the consistency of their testimony. Moreover, we find the district court's reasoning to be persuasive and note that its ultimate findings are amply supported by the record. Accordingly, we find no error in the district court's conclusions of law.

 Appellants' remaining contention, that Rule 16 obligated the government to disclose the oral opinion of Dr. Aronson, does not persuade us that the district court erred. At the outset, we recognize that the disclosure provision of Rule 16 is arguably broader than the *Brady* requirement. Under Rule 16(a)(1)(D), the information that the government must disclose need not be exculpatory; it merely must be material to the preparation of the defense. Although the question whether Rule 16(a)(1)(D)'s disclosure requirement applies to oral reports has not been resolved by this Court, we do not think that its resolution is necessary to the disposition of these appeals.[24] Assuming *arguendo* that that provision requires disclosure of oral opinions such as that involved here, the government's violation of the rule must prejudice substantial rights of the defendants before we may overturn their convictions. After review-

---

**24.** The two Courts of Appeals that have addressed this issue have concluded that Rule 16(a)(1)(D) only requires disclosure of written reports. *See United States v. Shue,* 766 F.2d 1122, 1135 (7th Cir.1985); *United States v. Glaze,* 643 F.2d 549, 555 (8th Cir.1981).

ing the record and appellants' arguments on appeal, we find that no substantial rights of the appellants were affected by the nondisclosure of Dr. Aronson's oral opinion which, in the district court's view, was either cumulative or incredible.

## IV.

Finally, we address those claims unique to Wolkowski's appeal from his conviction of conspiracy to obstruct justice.

### A. SUFFICIENCY OF THE EVIDENCE

■ Wolkowski reasserts on appeal his argument that the factual record in this case cannot support a reasonable jury verdict finding him guilty of conspiracy to obstruct justice. As we discussed in section II, the standard for reviewing Wolkowski's sufficiency of the evidence claim is whether, after resolving all inferences in favor of the government, "*any* rational trier of fact could have found essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (original emphasis). Under this standard our review is plenary. *Paez v. O'Lone*, 772 F.2d 1158, 1159 (3d Cir.1985). Wolkowski vigorously argues that the evidence was insufficient to sustain the government's factual allegations linking Wolkowski to a conspiracy to obstruct justice. In this regard, Wolkowski maintains that evidence of an agreement or of acts in furtherance of an illegal purpose is lacking. After carefully reviewing the record, we find these arguments without merit.

In support of his claim that there is insufficient evidence to convict him on Count 2, Wolkowski emphasizes testimony that the MCU took over the investigation in the early morning hours following Topolosky's death. Wolkowski's argument implies that, because the MCU was in charge, he had no control over the progress or conduct of the investigation. He contends that there is no evidence of any motivation on his part to conceal reports of the assault on Topolosky in the witness statements prepared by him and Troopers Mangione and Slattery, nor evidence of his ability to direct those troopers so to conceal the assault. On the latter point, Wolkowski emphasizes that he was not involved in the selection of Mangione and Slattery to assist in conducting the witness interviews. Similarly, Wolkowski argues that his failure to make a record of his interviews with Messerlian and McClelland is directly attributable to MCU's control over the investigation. Wolkowski misunderstands the charge against him. The fact that another entity was ultimately responsible for the investigation does not negate evidence that Wolkowski acted in furtherance of an illegal purpose. Notwithstanding the MCU's involvement, a rational juror could infer that Wolkowski did commit one or more of the "overt acts" attributed to him by the government.

Wolkowski's argument that he could not have arranged for the omission of references to the assault in the witness statements is based, in part, on various inconsistencies in the testimony. Where there are disputes in the testimony, however, they must be resolved in favor of the prosecution. *See Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793. The inconsistencies among the state troopers' versions of the taking of witness statements and the versions offered by the witnesses themselves are not of such magnitude as to raise reasonable doubts about the verdict. Such inconsistencies are not unusual given the long span of time between the events in question and the trial, the ubiquitous recollections of various witnesses and the nature of the charges. A rational trier of fact could certainly discredit the troopers' testimony about how the interviews were handled, and credit Velazquez's, Fontanez's and Guzman's assertions that they had described the assault to their interviewers.

Although the record leaves us doubting whether Wolkowski consistently failed to provide routine information to hospital personnel, that doubt alone is insufficient to raise grave concerns with regard to the reasonableness of the verdict. Absolute proof that Wolkowski repeatedly eluded requests for information concerning Topolosky's death was not essential to the

government's case or necessary to sustain a guilty verdict. Rather, the cumulative effect of Wolkowski's conduct, including the failure to provide information on at least two occasions, and the reasonable inferences drawn therefrom, amply support his conspiracy conviction.

Direct evidence in support of the government's argument that a "cover-up" began with the meeting between Wolkowski and Messerlian at the Newark barracks shortly after the accident is similarly lacking. As noted by the government, however, it "need not introduce evidence of a written, spoken or express agreement" to establish the formation of a conspiracy. Brief for the United States, Appeal No. 86–5345, at 19. "Rather, all that is required is evidence of a tacit agreement [that] may be inferred after consideration of all the circumstances." *Id.* We agree with the government that the evidence in the record is sufficient to allow a reasonable juror to find that Wolkowski entered into a conspiracy with Messerlian to conceal the assault on Topolosky and to obstruct all investigations—state and federal—into the circumstances surrounding Topolosky's death. Moreover, it is perfectly proper to allow the jury to infer these acts from circumstantial evidence. *See Paez*, 772 F.2d at 1160.

Finally, although Wolkowski was acquitted of perjury, there is ample evidence that he testified untruthfully at the federal grand jury proceedings. Inconsistency of the verdicts does not necessarily mean that the jury did not consider the evidence of perjury in deciding whether a conspiratorial act had occurred. In this regard, we note the well-established rule that jury verdicts in criminal cases will stand, despite internal inconsistencies, so long as there is sufficient evidence to support the verdict. *See United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) ("[T]here is no reason to vacate the respondent's conviction merely because the verdicts cannot be rationally reconciled.... Th[is] rule ... has stood without exception

in this Court for 53 years."); *Harris v. Rivera*, 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981); *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *see also United States v. Continental Group, Inc.*, 603 F.2d 444 (3d Cir.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). Our role upon review of such cases is not to attempt to rationalize the jury's verdict or to reconcile apparently inconsistent findings. Rather, we "need only determine whether there was sufficient evidence upon which the guilty verdict can be sustained." *United States v. McCall*, 592 F.2d 1066, 1068 (9th Cir.), *cert. denied*, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979); *see also United States v. McQueeney*, 674 F.2d 109, 115 (1st Cir.1982).

■ In this case, despite the apparent inconsistency of the jury's finding between Counts 2 and 3, its verdict retains vitality. We agree with the district court that "the facts of this case fit squarely within the *Dunn/Powell* rule, and we therefore reject any argument premised on the adoption of the purported reasoning of the jury." *Messerlian*, 633 F.Supp. at 1512. Thus, while not raised on appeal, we find that the evidence of perjury as an "overt act" of conspiracy could legitimately support a conviction on Count 2 by a rational trier of fact.

To prove conspiracy, the government must show beyond a reasonable doubt that one of the co-conspirators committed one or more overt acts in furtherance of an illegal objective.[25] Accordingly, the demonstration of a conspiracy under 18 U.S.C. § 371 requires only that the government show that an agreement was formed and that one of the conspirators committed at least one overt act in furtherance of the illegal purpose. *United States v. Forzese*, 756 F.2d 217 (1st Cir.1985); *United States v. Anderson*, 611 F.2d 504 (4th Cir.1979); *United States v. Lyman*, 592 F.2d 496 (9th

25. We note also that the government's allegation that Messerlian perjured himself before the federal grand jury was also charged as an overt act in furtherance of the conspiracy. Messerlian was convicted on that count, which demonstrates that the jury expressly found that *at least* one overt act was committed by one of the conspirators.

Cir.1978), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2864, 61 L.Ed.2d 300 (1979). *United States v. Trowery,* 542 F.2d 623 (3d Cir. 1976) (per curiam), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). Our review of the evidence convinces us that *"any* rational trier of fact," *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, could have found these elements of conspiracy as to Wolkowski beyond a reasonable doubt.

### B. WEIGHT OF THE EVIDENCE

Finally, Wolkowski claims that the verdict was against the weight of the evidence because the federal proceeding was unforeseeable. He also argues that the verdict was a miscarriage of justice, referring to the acquittal of himself, Mangione and Slattery on the perjury counts, the rejection of Dr. Aronson's post-trial evidence and his long career of public service in support of this claim.

Our review of this claim is governed by the "abuse of discretion" standard. *See United States v. Hsieh Hui Mei Chen,* 754 F.2d 817 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). We have already discussed and dismissed appellants' arguments with respect to the foreseeability instruction, the acquittal on perjury charges and Dr. Aronson's testimony. Furthermore, we are in complete accord with the reasons stated by the district court in denying the motion for a new trial. *See Messerlian,* 633 F.Supp. at 1512–16. We conclude, therefore, that the district court did not abuse its discretion in denying Wolkowski's motion. In doing so, we share in the district court's recognition "that the verdicts have unhappy implications for everyone within the criminal justice system," *id.* at 1516, not the least of whom are the individuals who appeal here.

### V.

### CONCLUSION

For the foregoing reasons, the convictions and sentences of the appellants will be affirmed.